**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 15-70766-JAD |
| | ) | |
| SOMERSET REGIONAL WATER | ) | Chapter 7 |
| RESOURCES, LLC, | ) | |
| | ) | Related to Doc. Nos. 1057, 1058 |
| Debtor. | ) | 1122 |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | X | |
| | ) | |
| SOMERSET TRUST COMPANY, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LARRY L. MOSTOLLER, | ) | |
| CONNIE J. MOSTOLLER, | ) | |
| | ) | |
| Respondents. | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | X | |

## MEMORANDUM OPINION

The matter before the Court concerns the interpretation of a post-petition financing order previously entered by the Court. This order was entered with the consent of the Debtor (Somerset Regional Water Resources, LLC), the Debtor's sole member (Mr. Larry Mostoller), and the Debtor's post-petition lender (Somerset Trust Company).

This Court has jurisdiction to interpret and enforce its prior orders. See Travelers Indem. Co. v. Bailey, 557 U.S. 137,149, 129 S.Ct. 2195, 2205 (2009). This matter is a core proceeding over which the Court has both subject-matter jurisdiction and the requisite statutory authority to enter a final order. See 28

U.S.C. §§157(b)(2)(A), 157(b)(2)(D), 157(b)(2)(K), 157(b)(2)(M), 157(b)(2)(O), and 1334(b).

Somerset Trust Company ("STC") is the Debtor's largest creditor and was the Debtor's pre-existing secured lender. Following the commencement of this bankruptcy case, the Debtor needed liquidity to support its current operations and approached STC regarding the Debtor's continued use of STC's cash-collateral. The Debtor also requested further working capital from STC in the form of post-petition financing to fund the Debtor's business affairs during the early parts of this bankruptcy case. By all accounts, the Debtor's continued use of cash-collateral and the acquisition of post-petition financing were viewed by the Debtor as being immediately necessary to avoid irreparable harm to its business and assets.

Working on a short timeframe, the Debtor, Mr. Mostoller, and STC (collectively referred to herein as the "Parties") negotiated a post-petition financing package. An important component of the financing package was Mr. Mostoller's pledge to STC of Mr. Mostoller's right to a federal income tax refund attributable to losses incurred by the Debtor in year 2015, and imputed to Mr. Mostoller by virtue of the Debtor's taxation as an S-Corporation. This element of collateral was important to STC because (a) the long-term viability of the Debtor's business was uncertain in light of the recent downturn of the energy markets, (b) the Debtor was already highly leveraged, and (c) the Debtor did not own any other significant unencumbered assets which could be pledged to support new lending by STC.

The Parties memorialized their agreement in a consent order submitted and approved by this Court, which was titled: *Final Order Pursuant to Sections 11 U.S.C. §546 of the Bankruptcy Code and Bankruptcy Rule 4001(c) Authorizing Postpetition Financing, Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, Granting Adequate Protection Pursuant to 11 U.S.C. §§363 and 364* ("Final DIP Order", ECF No. 138).

Ultimately, the losses sustained by the Debtor in 2015 generated a refund of federal income taxes paid in 2015. Through the carry-back of the unused portion of those 2015 losses, it also generated a tax refund of federal income taxes paid in 2013 and 2014. The refunds referenced herein were processed by the IRS in 2016, as set forth more fully below.

Specifically, the refund of taxes paid on account of tax years 2015 and 2013 were completely offset by the Internal Revenue Service against outstanding federal tax obligations owed thereby leaving only a tax refund of taxes paid with respect to the 2014 amended tax return of Mr. and Mrs. Mostoller (the "Respondents").

For purposes of clarity it is noted that the amended 2014 tax return was filed by the Respondents in 2016 based upon the operating losses attributable to the Debtor in 2015. This amended tax return was also filed at the same time the Respondents filed other tax returns, including their 2015 tax return. As such, by the instant contested matter, STC seeks payment of this refund set forth in the amended 2014 tax return contending it constitutes STC's collateral.

The operative issue presented by these proceedings is therefore whether the Final DIP Order mandates the payment of the remaining tax refund to STC. In this regard, a question has arisen as to whether ¶6 of the Final DIP Order contains an ambiguity which would bring the refund of taxes (paid by the Respondents in 2014) within the ambit of the tax refund pledged to STC (when such refund was obtained by the Respondents on account of the Debtor's 2015 operating losses).

STC contends that the refund of taxes paid in 2014 falls within the scope of the collateral pledged to STC. Towards this end, STC argues that (a) Mr. Mostoller's course of conduct and participation in negotiations of the Final DIP Order supports STC's position and mandates a finding that the refund at issue should be paid to STC, and (b) interpreting the Final DIP Order to exclude the refund of taxes paid in 2014 from the pledge of collateral to STC would lead to an "absurd and unreasonable" result because all the parties intended STC to receive the tax refund attributable to the Debtor's year 2015 operating losses.

The Respondents disagree and argue that the Final DIP Order does not contain any ambiguity, and they further contend that the refund of the 2014 taxes is free and clear of any collateral pledged to STC. The Respondents also argue that reading the Final DIP Order to exclude the refund of taxes paid in 2014 does not lead to an "absurd and unreasonable" result under the circumstances of this case. In this regard, the Respondents argue that STC got exactly what it bargained for. That is, no right to a refund for the 2014 taxes

4

paid even though the refund is on account of the carryback of the Debtor's 2015 losses.

**I.**

**<u>BACKGROUND</u>**

The Debtor is a limited liability company taxed as an S-Corporation. *Stipulation* ¶2, ECF No. 1082. Prior to the Debtor's bankruptcy filing, Mr. Mostoller was the sole owner or member of the Debtor. <u>See</u> Tr. of Jan. 26, 2017 Hr'g 45:8-18, ECF No. 1055; *Stipulation* ¶¶2, 5. Being taxed as an S-Corporation, the Debtor's profits and losses were imputed to the Respondents, which were then reported on the Respondents' joint tax returns. *Stipulation* ¶6.

Prior to 2015, the Debtor was a profitable enterprise. However a downturn in the oil and gas industry caused the Debtor to experience significant losses, resulting in a deductible tax loss of $6,356,642 for 2015. *Stipulation* ¶32.

Given the downturn in business and the significant operating losses it had incurred, the Debtor commenced this bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on November 9, 2015. <u>See</u> *Voluntary Petition*, ECF No. 1.

As part of its turnaround efforts, the Debtor retained Compass Advisory Partners LLC and its managing director, John W. "Jack" Teitz ("<u>Teitz</u>"), to serve as the Debtor's Chief Restructuring Officer. *Stipulation* ¶14.

Upon commencement of the case, the Debtor recognized an immediate need for continued access to the cash collateral (i.e., collected accounts

receivable) pledged to STC and a need for further working capital in the form of post-petition financing.  As a result, the Debtor (through Teitz) approached STC[1] regarding the Debtor's working capital needs.  Discussions ensued and those discussions resulted in an agreement between the Parties.

Thereafter, on December 2, 2015, the Debtor filed its *Motion for an Interim Order Allowing Use of Cash Collateral and Debtor in Possession Financing and Request for an Expedited Hearing in Regard to Same* ("Expedited Motion for DIP Financing," ECF No. 48). *Stipulation* ¶15.

In the Expedited Motion for DIP Financing, the Debtor explained the importance of the financing it obtained from STC.  In this regard, the Debtor stated as follows:

> Without the use of cash collateral and the approval of the financing, the Debtor will be seriously and irreparably harmed, resulting in significant losses to the Debtor's estate and its creditors. . . . It goes without saying that the Debtor's inability to use Cash Collateral and obtain the financing proposed would cause immediate and irreparable harm to the estate. If the Debtor cannot pay its ongoing operating expenses, the Debtor simply will have no business to reorganize.

See Expedited Motion for DIP Financing 4, ¶¶16-17, ECF No. 48.

Following a hearing held December 4, 2015, the Expedited Motion for DIP Financing was granted on an interim basis. See *Interim Order Granting Expedited Motion for DIP Financing* ("Interim DIP Order"), ECF No. 68. The Interim DIP Order was executed by Counsel for the Debtor, Counsel for STC, and Mr. Mostoller, individually. See Interim DIP Order 20, ECF No. 68.

---

[1] As of the petition date, the Debtor was indebted to STC for pre-petition loans in the amount of $3,320,996.26, for which Mr. Mostoller was a personal guarantor. *Stipulation* ¶¶12-13.

A final hearing on the Expedited Motion for DIP Financing was held on January 5, 2016. At the hearing, Mr. Mostoller was represented by Steven Shreve, Esq. See Tr. of Jan. 5, 2016 Hr'g 4:20-21, ECF No. 1073.  He was also represented from time to time by attorney Salene Mazur Kraemer, Esq.

During the course of the January 5th hearing, Counsel for the Debtor iterated the importance of the post-petition financing provided by STC, and described the entry of the final order as "imperative" for the continuation of the case. Tr. of Jan. 5, 2016 Hr'g 8:22-9:8, ECF No. 1073.

Counsel for the Debtor also explained that in the effort to obtain financing from STC, a tax refund due to Mr. Mostoller in the approximate range of $2 million to $2.5 million, subject to offsets for certain tax obligations, had been pledged to STC as a security for the financing. Tr. of Jan. 5, 2016 Hr'g 8:9-17, ECF No. 1073.  Such offsets were estimated to be approximately $1.2 million, thereby leaving an estimated expected net tax refund of $800,000 to $1.3 million. See Affidavit of Robert L. Enos of Somerset Trust Company ("Enos Affidavit") at ¶¶11, 12 and 22-25.

Counsel for STC emphasized at the January 5th hearing the importance of the tax refund in inducing STC to provide the financing.  Counsel to STC's statements to the Court included describing the tax refund pledge as an "important component of the collateral package" and a "major motivation" inducing STC to advance new monies to the Debtor. Tr. of Jan. 5, 2016 Hr'g 11:20-23, 44:3-8, ECF No. 1073.

In particular, the tax return collateral was an important inducement to STC's lending decision because (a) the long-term viability of the Debtor's business was uncertain in light of the recent downturn of the energy markets, (b) the Debtor was already highly leveraged, and (c) the Debtor did not own any other significant unencumbered assets which could be pledged to support new lending by STC. See Enos Affidavit ¶¶7-26; *Affidavit of David L. Fuchs* ("Fuchs Affidavit") at ¶¶6 and 33; *Affidavit of John W. (Jack) Teitz of Compass Advisory Partners, LLC* ("Teitz Affidavit") at ¶¶22-29.

Following the January 5, 2016 hearing, the Court entered the Final DIP Order. Paragraph 6 of the Final DIP Order addresses the tax refund at issue and provides, in part, that:

> Mostoller further agrees to assign to Lender any rights or interest in the 2015 Federal tax refund due to him individually, but attributable to the operating losses of the Debtor (the "Tax Refund") subject to the setoff rights of the Internal Revenue Service and past due Pre-Petition and application of PA State fiduciary tax obligations of the Debtor . . . .

See Final DIP Order 7.

After the Court's approval of the Final DIP Order, STC advanced $740,000 of new funds to the Debtor. See *Motion Seeking Release of Certain Tax Refund Check to Somerset Trust Company*, at ¶17, ECF No. 1057. It also appears that $703,863 of STC's cash collateral was expended by the Debtor. See *Monthly Financial Report for the Period of 1/1/2016 to 1/31/2016 (Schedule of Cash Receipts and Disbursements)*, ECF No. 328.

Notwithstanding the working capital provided to the Debtor, STC's concerns regarding the long-term viability of the Debtor proved prophetic.

Within a month of entry of the Final DIP Order and the advance of new funds, STC determined that the Debtor was in default of the Final DIP Order and sought appointment of a Chapter 11 Trustee. See *Expedited Motion to Appoint a Chapter 11 Trustee* (the "Trustee Motion"), ECF No. 228.   According to the Trustee Motion, the Debtor's defaults included the fact that (a) the Debtor failed to operate within its budget, (b) the Debtor failed to generate any additional significant revenues (and barely had any additional inflows of cash) beyond either the borrowings from STC and the use of STC's cash collateral, and (c) the Debtor's personal property became subject to increasing claims and requests for relief from stay by equipment lessors or financiers thereby jeopardizing the continuation of the Debtor's business operations. See Trustee Motion at ¶¶1-12.

The motion was granted and a Chapter 11 Trustee was appointed by the Court.  Shortly thereafter, upon motion of the Chapter 11 Trustee and by order dated February 25, 2016, the case was converted to a case under Chapter 7 of the Bankruptcy Code. See *Order Converting the Debtor's Chapter 11 Case to a Case Under Chapter 7*, ECF No. 365.

On December 16, 2016, STC filed its *Motion to Compel Compliance with Final DIP Order* ("Motion to Compel"), citing Mr. Mostoller's alleged failure to file his 2015 tax return despite STC's numerous requests for him to do so. See Motion to Compel, ECF No. 901.  A hearing was held on the Motion to Compel

on January 26, 2017, at which time Mr. Mostoller, appearing pro se, informed the Court that his 2015 federal tax return, as well as amended versions of his 2013 and 2014 federal tax returns, (collectively, the "<u>Federal Tax Returns</u>") had been filed on his behalf by accountant Randy Tarpey of Sickley Tarpey & Associates.  To support his claim that the Federal Tax Returns were filed, Mr. Mostoller filed copies of the Federal Tax Returns with the Court. <u>See</u> Tr. of Jan. 26, 2017 Hr'g, 39:18-42:11.

The Federal Tax Returns reflect that the 2015 operating losses incurred by the Debtor, and imputed to the Respondents, resulted in a refund of federal taxes paid in 2015 in the amount of $125,978. <u>See</u> *Stipulation* ¶¶34-36. The unused portion of the 2015 operating losses was then carried-back to the 2013 and 2014 tax years, for which amended returns were filed. The 2015 operating losses therefore resulted in refunds of taxes paid in 2013 and 2014 in the amount of $142,868 and $1,810,755, respectively.  <u>See</u> *Stipulation* ¶¶39-44.

In total, the Respondents were entitled to a refund on account of the Federal Tax Returns in the amount of $2,079,601.00. <u>See</u> *Stipulation* ¶46. However, prior to distribution, the Internal Revenue Service offset outstanding obligations and penalties owed by the Respondents, resulting in a total offset of the refund of federal taxes paid in the 2013 and 2015 tax years, and a reduction in the refund of federal taxes paid in 2014 to $1,124,538.31. <u>See</u> *Stipulation* ¶¶47-54.

Following the hearing on the Motion to Compel, the Court entered an order directing that, *inter alia,* Mr. Mostoller and/or his affiliates and agents,

10

immediately turn-over to the Court "any refund he is due on account of the 2015 Tax Returns[.]" *Order Granting Motion to Compel Compliance with Final DIP Order*, ECF No. 934.

The Court then received a check dated July 17, 2017 and issued by the United States Treasury listing as payees, "Larry L. & Connie J Mostoller" in the amount of $1,124,538.31 (the "Refund Check").

Upon receipt of the Refund Check, the Court issued an order dated July 21, 2017, requiring that any party asserting an interest in all or part of the Refund Check file a motion for release by August 4, 2017. In response to the order, on August 3, 2017, STC filed its *Motion Seeking Release of Certain Tax Refund Check to Somerset Trust Company* ("STC Motion for Release," ECF No. 1057).

Pursuant to the STC Motion for Release, STC sought payment of half of the amount of the Refund Check, after deduction for payment of the accountant fees. During the proceedings with respect to the STC Motion to Release, STC had no objection to the remaining half being paid to Mrs. Mostoller. It appeared that such resolution was in line with the prior negotiations of the Parties as well as the discussion on record during the January 26, 2017 hearing on the Motion to Compel. STC Motion for Release ¶20, ECF No. 1057. Those discussions were that STC recognized that the Respondents believed that some portion of the tax refund was not attributable to the operating losses of the Debtor. Rather, without providing any proof, the Respondents argued that such sums could possibly be on account of other tax

deductions that the Respondents may have had or were attributable to taxes paid by Mrs. Mostoller only.  In any event, the proposed split of the Refund Check was effectively a settlement of these issues raised by the Respondents.

On August 4, 2017, the Respondents filed their own motion seeking release of the full Refund Check net of accountant fees ("Respondents' Motion for Release," ECF No. 1058). As the basis for their motion, the Respondents argued that under the terms of the Final DIP Order, Mr. Mostoller only pledged his portion of the refund due to him on account of his 2015 federal tax return, whereas the Refund Check represented the refund requested by the Respondents' amended 2014 federal tax return.  In support, the Respondents emphasized that the Refund Check read, in part, "MOST KANSAS 12/2014 TAX REFUND." See Respondents' Motion for Release ¶6, ECF No. 1058.  As expected, STC objected to the Respondents' Motion for Release. See *Objection to Motion Seeking Release of Check*, ECF No. 1060.

A hearing on the competing claims to the tax refund was held on August 25, 2017. Unable to resolve the matter, the issue was set for evidentiary hearing. In the interim, and as set forth above, the parties agreed at the August 25, 2017 hearing that after payment of the accountant's fees ($50,750.00), fifty-percent the remaining balance of the Refund Check was to be distributed to the Respondents. See *Consent Order Regarding Competing Motions Seeking Release of Certain Tax Refund Check* ("Consent Order dated Aug. 31, 2017," ECF No. 1069).  To effect this result, and pursuant to the Consent Order dated Aug. 31, 2017, the Clerk of the U.S. Bankruptcy Court then released the

12

Refund Check to the Respondents, who in turn endorsed the Refund Check to STC. STC negotiated the Refund Check and, after distribution of the accountant fees, distributed one-half of the remaining proceeds of the Refund Check to the Respondents. Taking these distributions into account, the remaining amount in controversy is $536,894 which is being held by STC pending the outcome of these proceedings and until further order of this Court.[2]

An evidentiary hearing on STC's motion for release was held on January 26, 2018. At this hearing, STC presented the testimony of Teitz, David L. Fuchs, Esq. ("Fuchs"), Counsel for the Debtor; Robert L. Enos ("Enos"), Senior Vice President and Senior Loan Officer at STC, and Randy Tarpey ("Tarpey"), Certified Public Accountant.

The direct testimonies of Teitz, Fuchs, Enos, and Tarpey were presented by affidavit, and all of these witnesses were either subject to live cross-examination or cross examination was waived by the Respondents.[3] The Respondents elected to not testify at trial. They also did not present any other witness testimony of their own.

Two days prior to the evidentiary hearing, the Respondents did file a motion *in limine* seeking to exclude all extrinsic evidence offered by STC

_____

[2] Plus any additional sums earned by virtue of the funds' placement into an interest-bearing escrow account. See Consent Order dated Aug. 31, 2017 ¶5, ECF No. 1069.

[3] By agreement of the parties, hearsay objections to the affidavits were waived and the affiants were either present and available for cross-examination at trial or (in the case of Mr. Tarpey) attendance at trial was excused. In fact, Mssrs. Teitz, Fuchs, and Enos were cross-examined at trial. In the course of observing their demeanor and the substance of their testimony, the Court finds such witnesses to be credible.

(including the affidavits referenced above).  The gist of the motion *in limine* is that the Respondents contend the evidence submitted by STC is barred by the parol evidence rule.  Alternatively, the Respondents contend that the affidavits should be excluded because counsel for STC served as the scrivener in preparing the affidavits.  STC opposed the motion *in limine* and argument on the motion was held immediately prior to the evidentiary hearing.

Following the hearing, the parties were provided the opportunity to file post-trial briefs. STC filed its post-trial brief on February 16, 2018. The Respondents filed their post-trial brief on March 1, 2018, to which STC filed a reply brief on March 7, 2018.  By order dated July 25, 2018, this Court requested further briefing on certain legal issues, which was completed by the parties on or about August 17, 2018.  STC's motion for release and the Respondents' motion *in limine* are now ripe for adjudication.

## II.
## LEGAL ANALYSIS

Resolution of the pending matter requires the Court to interpret the relevant provisions of the Final DIP Order, which was entered with the consent of STC, the Debtor, and Mr. Mostoller.

Paragraph 6 of the Final DIP Order reads, in part, as follows:

Mostoller further agrees to assign to Lender any rights or interest in the 2015 Federal tax refund due to him individually, but attributable to the operating losses of the Debtor (the "<u>Tax Refund</u>") subject to the setoff rights of the Internal Revenue Service and past due Pre-Petition and application of PA State fiduciary tax obligations of the Debtor and further subject to any validity[sic] existing, properly perfected lien and security interest of Community Bank, as of the Petition Date, in and to the Tax Refund.

14

See Final DIP Order at ¶6.   The primary dispute between STC and the Respondents is whether this paragraph of the Final DIP Order contains an ambiguity as to the scope of the tax refund pledged to STC.

STC alleges that the tax refund pledged in paragraph 6 is not limited to a refund of taxes paid in 2015, but instead refers to all refund proceeds "attributable to the operating losses of the Debtor" that were incurred in tax year 2015. *Somerset Trust Company's Post-Trial Brief with Respect to the Remaining Balance of the Tax Refund Proceeds* ("STC Post-Trial Brief") 3, ECF No. 1141.

In STC's view, the phrase "attributable to the operating losses of the Debtor" in paragraph 6 of the Final DIP Order modifies the preceding term "2015 Federal tax refund."  As a result, STC argues that these phrases refer to all federal tax refunds attributable to or paid on account of the 2015 operating losses of the Debtor. STC Post-Trial Brief 7.  This would include the refund of federal taxes paid by the Debtor in 2014, as that refund was generated on account of the 2015 operating losses. In fact, the Debtor was only able to amend its tax returns in year 2016 and receive this refund once it had the year 2015 operating losses to "carry back."

The Respondents contest that any ambiguity exists. Instead, the Respondents proffer that the tax refund at issue is not a "2015 Federal tax refund" and is instead a prior year tax refund.  The Respondents further argue in their motion *in limine* that due to the lack of ambiguity, the Final DIP Order should be interpreted without reference to parol evidence of any sort. Indeed,

as the Third Circuit Court of Appeals has held: "[o]nly where the writing is
ambiguous may the factfinder examine all the relevant extrinsic evidence to
determine the parties' mutual intent." <u>Duquesne Light Co. v. Westinghouse
Elec. Corp.</u>, 66 F.3d 604, 613 (3d Cir. 1995).

Therefore, a fundamental question before the Court is whether paragraph
6 of the Final DIP Order is ambiguous.  If it is ambiguous, then another
question before the Court is whether the extrinsic evidence clears up the
ambiguity and entitles STC to the remaining portion of the tax refund.

For the reasons explained below, the Court finds that paragraph 6 is
ambiguous.  The Court also finds that the evidence of record supports the
construction of paragraph 6 as postulated by STC.  As a result, STC is entitled
to the remaining tax refund proceeds.

## <u>Legal Standards Regarding Ambiguity</u>

The Third Circuit Court of Appeals has held: "[s]ince a consent decree
issued upon the stipulation of the parties has the characteristics of a contract,
contract principles govern its construction." <u>McDowell v. Philadelphia Hous.
Auth. (PHA)</u>, 423 F.3d 233, 238 (3d Cir. 2005); <u>see also</u> <u>United States v. New
Jersey</u>, 194 F.3d 426, 430 (3d Cir. 1999) ("Further, as consent decrees have
many of the attributes of contracts, we interpret them with reference to
traditional principles of contract interpretation."); <u>Fox v. U.S. Dep't of Hous. &
Urban Dev.</u>, 680 F.2d 315, 319 (3d Cir. 1982).

Consistent with this holding, principles of contract interpretation have
been held to govern interpretation of a consent order entered by a bankruptcy

court. <u>See e.g.</u> <u>In re Trico Marine Servs., Inc.</u>, 450 B.R. 474 (Bankr. D.Del. 2011) ("When construing an agreed or negotiated form of order, such as the Sale Order in this case, the Court approaches the task as an exercise of contract interpretation rather than the routine enforcement of a prior court order").

A tenant of traditional contract interpretation is that in the absence of ambiguity a contract should be enforced according to its terms. <u>McDowell</u>, 423 F.3d at 238.

Whether a consent decree is ambiguous is a question of law for this Court to decide.  In this regard, the Court is called upon to determine whether, "from an objective standpoint, [the decree] is reasonably susceptible to at least two different interpretations." <u>McDowell</u>, at 238 (bracketed language in the original) (quoting <u>United States v. New Jersey</u>, 194 F.3d at 430; <u>see also</u> <u>SOF-VIII-Hotel II Anguilla Holdings LLC v. Akin Gump Strauss Hauer & Field LLP (In re Barnes Bay Dev. Ltd.)</u>, 478 B.R. 185, 191 (D.Del. 2012) (interpreting a DIP order) (quoting <u>United States v. New Jersey</u>, 423 F.3d at 430).

Stated in other words, ordinarily, interpretation of a consent decree should be confined to the "four corners" of the document. <u>McDowell</u>, at 239. Courts should "not try to divine [the consent decree's] meaning from speculation about the purposes of the parties or the background legal regime." <u>McDowell</u>, at 239.

This "four corners" rule comports with the ordinary principle of contract construction which provides that the use of extrinsic evidence is only

permissible when the instrument in question is itself ambiguous. See Fox v.

U.S. Dep't of Hous. & Urban Dev., 680 F.2d at 319.

However, when a consent decree is found to be ambiguous, applicable

law provides that extrinsic evidence may be used to adjudicate the consent

decree's meaning. See McDowell at 238; See also Fox, at 319.  As the Third

Circuit Court of Appeals has instructed:

> The first task, therefore, is to determine whether the instrument by
> its terms unambiguously covers the dispute. The relevant search,
> as in contract interpretation, is not for the subjective intention of
> the parties "but what (their) words would mean in the mouth of a
> normal speaker of English, using them in the circumstances in
> which they were used."[ ] The rule employed to reach this result is
> that language must be interpreted in accordance with its generally
> prevailing meaning unless the parties manifest a different intention
> or the words are technical. ITT Continental Baking, 420 U.S. at
> 238, 95 S.Ct. at 935; see Restatement (Second) of Contracts s
> 202(3). As in statutory construction, we reject a view that would
> "make a fortress out of a dictionary," Cabell v. Markham, 148 F.2d
> 737, 739 (2d Cir.) (L. Hand, J.), aff'd 326 U.S. 404, 66 S.Ct. 193,
> 90 L.Ed. 165 (1945), because a word or a phrase "is not a crystal,
> transparent and unchanged, it is the skin of a living thought and
> may vary greatly in color and content according to the
> circumstances and the time in which it is used." Towne v. Eisner,
> 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918)
> (Holmes, J.).

Fox v. U.S. Dep't of Hous. & Urban Dev., 680 F.2d at 320.

In setting forth their arguments, the parties cite to principles of

Pennsylvania law governing contract interpretation. Pennsylvania law

recognizes two types of contractual ambiguity—patent and latent. See Bohler-

Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 93 (3d Cir. 2001).

"While a patent ambiguity appears on the face of the instrument, 'a latent

ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous.' " Bohler-Uddeholm, 247 F.3d at 93 (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d at 614).

A claim of latent ambiguity must be based on a "contractual hook." Bohler-Uddeholm, 247 F.3d at 93. Significantly, where a claim of latent ambiguity is asserted, the court may look beyond the four corners of the document to determine whether a latent ambiguity exists. Id. However, "a court must consider whether the extrinsic evidence that the proponent of the alternative interpretation seeks to offer is the type of evidence that could support a reasonable alternative interpretation" of the contract. Id.

In addition to the principles set forth above, the United States Supreme Court has found that reliance on certain aids to interpretation does not conflict with the "four corners" rule and a court may consider other certain interpretive aids in determining whether an ambiguity exists within a consent decree. See United States v. ITT Continental Baking Co., 420 U.S. 223, 228, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); see also United States v. New Jersey, 194 F.3d at 430 (observing that the first step in contract interpretation was to "determine whether this phrase is ambiguous in light of the context in which the decree was signed and the specialized meaning of any words used").

Such permissible extrinsic aids recognized by the United States Supreme Court include "the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any

19

other documents expressly incorporated in the decree." <u>ITT Continental Baking</u>

<u>Co.</u>, 420 U.S. at 228; <u>accord</u> <u>United States v. New Jersey</u>, 194 F.3d at 430.

### **Patent Ambiguity and the Final DIP Order**

The first issue for resolution is whether the Final DIP Order, specifically

paragraph 6, is ambiguous on its face.

As stated above, a consent decree is ambiguous if from an objective

standpoint it could be reasonably interpreted in two or more different ways.

<u>McDowell</u>, 423 F.3d at 238.

The Respondents argue that the Final DIP Order is not patently

ambiguous.  To support this argument, the Respondents contend that STC has

stipulated that the operative language is unambiguous.

Initially, this contention of the Respondents had inertia.  By way of

example, the record reflects that STC's motion and related papers initially

described the language in paragraph 6 of the Final DIP Order as being

"inartful" and ambiguous.[4]   Notwithstanding these assertions, STC later

focused its arguments before the Court on the existence of a latent ambiguity

in the Final DIP Order. <u>See e.g.</u> STC's Post-Trial Brief.  STC also stated in its

post-trial brief that: "While the Assignment of the Final DIP Order appears

unambiguous on its face, it contains a latent ambiguity." STC Post-Trial Brief

7.

---

[4] Counsel for STC stated: "I think to the extent that the language is somewhat inartful in the final DIP order, I think it's ambiguous, you know, as to whether it refers to taxes actually paid in 2015 or whether it refers to refunds generated on account of losses claimed in 2015 pursuant to a 2015 tax return." Tr. of Aug. 25, 2018 Hr'g 12:9-12:12, ECF No. 1116.

These assertions created the appearance to the Court that the parties agreed that the pertinent provision of the consent order was not patently ambiguous. However, a full examination of the record, a review of the language used in paragraph 6 of the Final DIP Order, and due consideration of applicable law leads this Court to conclude that such statements of STC do not discretely decide the matter.

The Court reaches this conclusion because whether an ambiguity exists in a consent order or contract is a question of law for the Court to decide. See McDowell, 423 F.3d at 238. In fact, it is well-settled law that courts are not bound by stipulations regarding questions of law. Ulitchney v. Ruzicki, 412 F. App'x 447, at *4 (3d Cir. Jan. 5, 2011)(quoting Mintze v. American Gen. Fin. Servs., Inc. (In re Mintze), 434 F.3d 222, 228 (3d Cir. 2006)).

The Third Circuit Court of Appeals held as much in Mintz v. American Gen. Fin. Servs., Inc., supra, wherein a debtor sought to enforce a prepetition claim for rescission of a mortgage containing a mandatory arbitration clause. In Mintz, the lender filed a motion to compel arbitration. At the hearing on the motion to compel, the parties stipulated (1) that the matter was a "core" matter, and (2) that the bankruptcy court had discretion to deny enforcement of the arbitration clause. Id. at 227. The bankruptcy court accepted the stipulations and denied the motion. The lender then appealed to the district court, which affirmed the holding of the bankruptcy court. On appeal to the Third Circuit, the lender argued, in direct contrast to its stipulations, that the matter was not

21

core, but even if it was, that the bankruptcy court lacked discretion to deny the enforceability of the arbitration clause.

In resolving the matter in <u>Mintz</u>, the Third Circuit first observed that it is not bound by parties' stipulations concerning questions of law. <u>Id</u>. at 228. Noting that whether a proceeding is core or non-core and whether a bankruptcy court has discretion to deny the enforceability or applicability of an arbitration clause are both questions of law, the Third Circuit determined that the stipulations at issue were not binding on the court. <u>Id</u>. Ultimately, the Third Circuit chose to accept the parties' stipulations that the matter was "core," finding that they were actually consistent with the law, and found that the bankruptcy court did not have discretion to deny the arbitration clause. <u>Id</u>. at 232.

The Third Circuit reinforced the proposition that stipulations regarding questions of law are not binding in <u>Ulitchney v. Ruzicki</u>, <u>supra</u>, at *4 (3d Cir. Jan. 5, 2011). In that case, a homeowner brought suit against a parole officer for a warrantless entry into her home. Prior to trial, the parties stipulated that, in the absence of a warrant, a law enforcement official may only enter a residence with a resident's voluntary consent.  Despite the stipulation, the parole officer reversed course and argued that he did not need a warrant for entry. The district court initially instructed the jury that the stipulation regarding the necessity of a warrant was one of fact and was binding for the purpose of the trial. However, on post-trial motion, the district court ruled that it had erred in its prior holding and set aside the joint stipulation to rule in

22

favor of the parole officer. On appeal, the homeowner argued that the district court erred in setting aside the joint stipulation "which formed the basis for the parties' presentation of evidence and argument at trial." In reviewing the effect of the stipulation, the Third Circuit, held that:

> It is well-settled that courts "are not bound by the parties' stipulations concerning questions of law." In re Mintze, 434 F.3d 222, 228 (3d Cir.2006). It is a similarly "well-recognized rule of law that valid stipulations entered into freely and fairly, and approved by the court, should not be lightly set aside." Waldorf v. Shuta, 142 F.3d 601, 616 (3d Cir.1998) (internal quotation omitted) (emphasis added). A stipulation of law, however, is invalid, and must be distinguished from a stipulation of fact. United States v. Reading Co., 289 F.2d 7, 9 (3d Cir.1961) (upholding a factual stipulation, because, in part, it "is not a stipulation of the controlling law, which the parties could not validly make").

See Ulitchney, 412 F. App'x 447, at *4.

Courts outside of the Third Circuit, including the Supreme Court, have similarly found that stipulations concerning questions of law are not binding on the court. See e.g. Thompson v. Roland (In re Roland), 294 B.R. 244, 250 (Bankr. S.D.N.Y. 2003) (recognizing that the interpretation of a contract is a question of law and as such ". . . a stipulation regarding the interpretation of a contract does not bind the court").

For example, in Swift & Co. v. Hocking Valley Railway Co., 243 U.S. 281, 290, 37 S.Ct. 287, 61 L.Ed. 722 (1917), Justice Brandeis had to address whether a stipulation by the parties that railroad tracks were "private tracks" as opposed to "carrier's tracks" for purposes of calculating a demurrage fee was a nullity. Writing for the majority, Justice Brandeis held: "If [a] stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is

23

obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law." Id.; accord Noel Shows, Inc. v. United States, 721 F.2d 327, 330 (11th Cir. 1983) (upholding the lower court's exclusion of evidence even though the parties had stipulated to its admission. Observing that whether evidence should be admitted is a question of law and "[a] stipulation by the parties to a lawsuit as to questions of law is not binding on the trial court." (citation omitted)); and Sinicropi v. Milone, 915 F.2d 66 (2d Cir. 1990) (recognizing that a court is not bound by a stipulation on questions of law).

In light of this precedent, the Court must make its own independent judgment of law as to whether the Final DIP Order is patently ambiguous.[5]  In doing so, the Court appreciates the parties respective interpretations—that is STC's claim that paragraph 6 should be read to include any tax refund generated on account of the 2015 operating losses versus the Respondents' interpretation that the plain text limits the pledge only to a refund of taxes paid on account of a 2015 federal tax return (and not any amended prior year returns filed in connection therewith).

[5] In arriving at this conclusion, the Court notes that even though STC later focused its arguments on the existence of a latent ambiguity, STC preserved its patent ambiguity argument at pages 24-26 of its pre-trial memoranda, even though it is under a heading labeled "latent ambiguity." See ECF No. 1084 at pp. 24-26.  The Court also notes that the Respondents are not prejudiced by this Court's finding of a patent ambiguity. Given STC's earlier position regarding ambiguity, the Respondents had the opportunity to address patent ambiguity and did so in their *Memorandum of Law in Opposition to the Motion Seeking Release of Certain Refund Check to Somerset Trust Company*, ECF No. 1091. The Respondents were also provided further opportunity to address whether paragraph 6 of the Final DIP Order is patently ambiguous in response to this Court's supplemental briefing order dated July 25, 2018, which plainly asked the parties to brief issues regarding patent ambiguity. See *Order Directing that the Parties File Supplemental Briefs*, ECF No. 1215.

In looking at the plain language of the text of paragraph 6, the Court finds that it is subject to multiple reasonable interpretations. In so finding, the Court observes that the term "2015 Federal tax refund" is an undefined term that could have three distinct connotations.

First, as used in paragraph 6, the term "2015 Federal tax refund" could refer to a federal tax refund actually paid to Mr. Mostoller in year 2015 on account of any prior tax return processed by the IRS.[6] Second, the phrase "2015 Federal tax refund" could also refer to a refund of taxes previously paid by Mr. Mostoller in all prior years but for which a refund is now due or has become due on account of year 2015 tax events of the Debtor (including any refunds payable on account of a 2015 tax return or any amended returns filed by Mr. Mostoller).[7] Third, the phrase "2015 Federal tax refund" could also refer to a refund of federal taxes paid by Mr. Mostoller solely in connection with the 2015 tax year and no other (i.e., a refund due based on a 2015 tax return).[8]

---

[6] The transcript of the evidentiary hearing reflects the following exchange that supports this possible construction:

> THE COURT:   What is a 2015 federal tax return?
> MS. SCHORR: The federal tax refund was the –
> THE COURT:   Well, let's break it down a little bit.
> MS. SCHORR: OKAY.
> THE COURT:   Phrase 2015 federal tax refund.  2015 means the Year 2015, correct?
> MS. SCHORR: The tax year, correct.
> THE COURT:   And when you combine 2015 with the phrase, federal tax refund, does that mean a tax refund that's due and payable in Year 2015?
> MS. SCHORR: Yes, it does.  But we believe that's modified by the following language …

See Tr. of the Jan. 26, 2018 Hr'g 8:13-23, ECF No. 1139.

[7] This is essentially the interpretation advocated by STC.

[8] In a colloquy with the Court at the January 26, 2018 evidentiary hearing, counsel for the Respondents stated: "the 2015 federal tax refund means the refund that was due from the return filed in 2015." See Tr. of the Jan. 26, 2018 Hr'g 10:12-13, ECF No. 1139.

Of these three possible meanings of the phrase "2015 Federal tax refund," only the first possible translation is unreasonable. The Court reaches this conclusion because when the Final DIP Order was approved, year 2015 had essentially come and gone and there was no refund actually paid to Respondents in year 2015.

As such, only the other two interpretations of the phrase "2015 Federal tax refund" are reasonable. Given these two possible interpretations, it is appropriate for the Court to consider extrinsic evidence to ascertain what the phrase "2015 Federal tax refund" means, and whether the remaining proceeds of the Refund Check fall within the scope of this term. The answer to these questions are addressed more fully below.

## **Latent Ambiguity**

The Court notes that even if it were determined that the language of paragraph 6 of the Final DIP Order is not patently ambiguous, this Court would still nonetheless find it to be latently ambiguous.

A "latent ambiguity arises from extraneous or collateral facts, which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." Duquesne Light Co., supra, 66 F.3d at 614.

The Third Circuit Court of Appeals instructs that a party may rely on extrinsic evidence "but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties

intended something different that was not incorporated into the contract."
Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d at 93.   In this
regard, the Third Circuit reminds us that the "parties expectations, standing
alone, are irrelevant without any *contractual hook* on which to pin them." Id.
(quoting Duquesne Light, 66 F.3d at 614 & n. 9).

With this standard in mind, the Court holds that STC has developed a
framework and requisite showing for this Court to consider extrinsic evidence
based upon a claimed latent ambiguity.   Namely, even if the phrase "2015
Federal tax return" is unambiguous on its face, the contractual hook cited by
STC, which is the phrase "but attributable to the operating losses of the
Debtor," convinces the Court that paragraph 6 of the Final DIP Order is latently
ambiguous.

As articulated by STC, by adding the phrase "but attributable to the
operating losses of the Debtor," the parties certainly modified the meaning of
the phrase "2015 Federal tax refund."   Their linguistic preference appears to
encompass tax refund proceeds specifically "attributable to the operating losses
of the Debtor" in year 2015.   The predominant question, however, is to what
extent?   This question highlights the nature of the latent ambiguity embodied
in paragraph 6 of the Final DIP Order.   As such, considering extrinsic evidence
is appropriate under the circumstances of this case to determine the
appropriate resolution of the latent ambiguity and to determine the full
contours of the parties' bargain which formed the basis of their linguistic
preference and/or contractual hook.

### Circumstances and Other Acceptable Tools of Construction

For purposes of completeness, the Court further notes that a total lack of ambiguity may not preclude a party from offering some extrinsic evidence as a part of their case. Of course, the Respondents assert that no extrinsic evidence whatsoever may be consulted because the general rule is that interpretation of a contract or consent order must be confined to the four corners of the document. This "four corners" rule, enunciated in <u>United States v. Armour & Co.</u>, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971), is reflective of the precept that an unambiguous contract is to be interpreted according to its plain terms.

This Court's examination of precedent in this area, however, leads it to conclude that the "four corners" rule is not the Supreme Court's only pronouncement on matters of interpretation in the context of enforcement of consent orders and contracts. Nor is it the only pronouncement of the Third Circuit Court of Appeals or the trial courts within the Third Circuit.

In <u>ITT Continental Baking Co.</u>, <u>supra</u>, the Supreme Court was tasked with interpreting a consent decree which prohibited the "acquiring" of a certain type of asset. At issue in that case was whether the term "acquiring" should be interpreted as a singular occurrence or ongoing event for purposes of assessing sanctions. In construing the term, the Supreme Court permitted the introduction of certain extrinsic evidence, stating:

> Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the

28

consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree. Such reliance does not in any way depart from the "four corners" rule of <u>Armour</u>.

<u>ITT Continental Baking Co.</u>, 420 U.S. at 238.

The Third Circuit further clarified whether these aids to construction may be considered prior to or only after a finding of ambiguity stating that "resort to extrinsic evidence is permissible, but only when the decree itself is ambiguous, although circumstances surrounding its formation are **<u>always</u>** relevant to its meaning." <u>United States v. New Jersey</u>, 194 F.3d at 430 (emphasis and underline added); <u>see also</u> <u>Fox v. U.S. Dep't of Hous. & Urban Dev.</u>, 680 F.2d at 320.

Courts have also held that in order to determine whether an ambiguity exists a court may look at the "context in which the decree was signed and the specialized meaning of any words used." <u>New Jersey</u>, 194 F.3d at 430. Thus, this Court is not relegated to considering the "aids to construction" identified in <u>ITT Continental Baking Co.</u> only after an initial finding of ambiguity.  Rather, the Court may consider them in its determination of whether an ambiguity exists.

In reaching this conclusion, it is not lost on this Court that permitting a broad review of the circumstances surrounding the formation of a contract could potentially nullify the prohibition against introducing extrinsic evidence absent ambiguity. Surely creative counsel could argue that almost any extrinsic evidence is evidence of a circumstance surrounding formation. As such, it may be necessary to narrow the field in this respect. To do so, it is

appropriate to look at prior instances where the review of circumstances surrounding the formation of contracts was addressed.

In <u>United States v. New Jersey</u>, <u>supra</u>, the Third Circuit was asked to interpret a consent order that was entered in an employment discrimination case. The operative consent order contained language entitling to those hired under the consent decree to "all the emoluments of the job title to which they are appointed, including full retroactive seniority . . . ." <u>New Jersey</u>, at 428.

The dispute at the center of the litigation in <u>United States v. New Jersey</u> concerned whether the consent decree, and specifically the language quoted, entitled those hired to the wage step increases which matched their grant of retroactive seniority. While recognizing that a determination of ambiguity should be confined to the four corners of a document and should focus on the objective definitions of the language utilized, the Third Circuit nonetheless considered the dictionary definition of "emolument," as well as the general structure of awarding step increases under the state scheme—noting that the State of New Jersey did not dispute that seniority was a factor in determining pay and that counsel had conceded that "very few" individuals were denied step increases. <u>New Jersey</u>, at 431.

In addition to this "factual context," the Third Circuit also considered the context in which the district court had initially approved the decree. Of note, the Third Circuit observed that in approving the consent order, the district court made statements elucidating its understanding of the consent decree's terms to which the parties failed to object. Thus, in addition to the factual

backdrop, uncontested statements made in connection with the entry of the
consent order appear to fall within the realm of what may be permissibly
considered. See also United States v. City of Erie, Civ. Action No. 04-4, 2006
WL 3343896 (W.D.Pa. Nov. 17, 2006) (recognizing that unobjected to comments
made by the court in connection with the entry of a consent order are part of
the "context" in which it was entered); Bartock v. Bae Systems Survivability (In
re Bartock), 398 B.R. 135, 155 (Bankr. W.D.Pa. 2008) (statements made to the
court by counsel when announcing that a settlement had been reached, but
before such settlement was memorialized and presented to the court, are a
"relevant part of the circumstances surrounding the settlement").

In Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518 (3d
Cir. 1999) the Third Circuit reviewed a grant of summary judgment in
connection with the interpretation of an assignment clause whereby the
assignor assigned to an assignee any legal claims it had against the appellee.
The lower court found that the assignment clause was ineffective based upon
the record in that case. In setting forth the framework for review, the Third
Circuit noted that "[w]hen the meaning of contract language is at issue, we
affirm a grant of summary judgment only if the contract language is
unambiguous and the moving party is entitled to judgment as a matter of law."
Id. at 521. Thus, the operative issue was whether the appellant had provided a
reasonable alternative reading of the contract—i.e. whether the contract
contained an ambiguity. Id. at 521-522.

To determine whether a reasonable alternative reading had been advanced by the appellant, the Third Circuit employed general principles of contract law including the tenet that "[w]hen interpreting a contract, a court may consider extrinsic evidence of surrounding circumstances" to ascertain the intended meaning of the parties. Id. at 522 (citing 3 Arthur L. Corbin, Corbin on Contracts, §§ 542, at 100-04, 579, at 414-25; Restatement (Second) of Contracts § 524 cmt. b.) The Third Circuit ultimately found that the appellant had advanced a reasonable alternative interpretation based on the language of the assignment and extrinsic evidence (which included correspondence between the assignor and assignee and between the assignor and appellee). Id. at 522-523. In that matter, the correspondence conveyed the assignor's beliefs that the assignee was the appropriate party to bring action against appellee. Id. at 523 n. 5.

In Bartock v. Bae Systems Survivability (In re Bartock), supra, the debtor was embroiled in litigation with its former employer related to a non-compete agreement. After leaving his position with his former employer, BAE, the debtor began working for a competitor, Ibis Tek. BAE commenced an action in state court, the result of which was an agreed order prohibiting Ibis Tek from employing the debtor. The debtor sought relief and expressed to the bankruptcy court a desire to return to work at Ibis Tek. Ultimately, the parties entered into a settlement agreement which released the debtor from the non-compete agreement. However, a dispute remained as to whether the settlement agreement likewise released the debtor from the agreed state court order. BAE

32

argued that while the debtor could seek employment elsewhere he was still prohibited from being employed by Ibis Tek. Finding the language of the settlement agreement unambiguous, the Judge Agresti of this Court noted that the circumstances surrounding the formation of the settlement agreement indicated that Ibis Tek was a special case to the debtor and central to the dispute. Thus, if Ibis Tek were an exception to the settlement agreement, it would have been explicit in the settlement agreement. In noting that Ibis Tek was a special case and central to the dispute, Judge Agresti considered Ibis Tek's involvement in the state court proceedings, that the debtor specifically sought relief to work for Ibis Tek, and that Ibis Tek was the company the debtor was working for when BAE brought action against him.

Conversely, although not explicitly categorized as "circumstances surrounding the formation of the contract" type of case, the Third Circuit in Harley-Davidson, Inc. v. Morris, 19 F.3d 142 (3d Cir. 1994) excepted from consideration any parol evidence of "prior inconsistent terms or negotiations" to demonstrate the intent of the parties. In that case, a seller of merchandise entered into a consent judgment which prohibited the seller from utilizing Harley-Davidson trademarks.  After entry of the consent judgment, contempt proceedings were brought against the seller in part for selling t-shirts containing the Harley-Davidson trademark.  The seller argued that he was not in contempt because he had reached an oral agreement with Harley-Davidson prior to entry of the consent judgment under which he could continue to sell the t-shirts until his existing supply was exhausted.  These facts in Harley-

Davidson, Inc. v. Morris are distinguishable from the case at hand because STC does not seek to introduce evidence of a collateral agreement which directly contradicts the plain terms of the Final DIP Order.  Rather, STC seeks to introduce evidence of what the contract's terms mean.  As such, STC's efforts to utilize evidence of the circumstances surrounding the entry of the Final DIP Order is appropriate.

**The Fact That Counsel Aided in Drafting the
Affidavits Does Not Render Them Inadmissible**

Having found that the language of Paragraph 6 of the Final DIP Order is ambiguous, the Court may properly consider extrinsic evidence to adjudicate its meaning. See McDowell at 238; see also Fox, at 319. As set forth above, it is also appropriate for the Court to consider evidence of the circumstances surrounding the entry of the Final DIP Order.  Accordingly, the Respondents' motion *in limine* is denied.

In denying the motion *in limine*, the Court also recognizes that the Respondents have asked that this Court exclude the affidavits of Teitz, Enos, Tarpey, and Fuchs on the basis that the affidavits were drafted by counsel to STC and not the affiants themselves.  In making this request, the Respondents cite to no legal authority to suggest that an attorney drafted affidavit is *per se* inadmissible thereby warranting their exclusion.

The absence of such authority is not surprising because the weight of the case law is that it is a common and acceptable practice for counsel to draft witness affidavits. See Ford Motor Co. v. Edgewood Properties, Inc., 257 F.R.D. 418, 423 (D.N.J. 2009)("[a]ttorneys frequently work with witnesses to prepare

34

their statements"); <u>Reynolds v. Jamison</u>, 488 F.3d 756, 769 (7th Cir. 2007)(affidavits "are typically drafted by lawyers"); and <u>Russell v. Acme-Evans, Inc.</u>, 51 F.3d 64, 67 (7th Cir. 1995)("Almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants").

The United States District Court for the Western District of Pennsylvania has also found that a declaration drafted by counsel, rather than the witness, is proper. <u>Pritchard v. Dow Agro Sciences</u>, 263 F.R.D. 277, 282-83 (W.D. Pa. 2009). Specifically, in <u>Pritchard</u>, the District Court rejected the defendant's contention that an expert's declaration was not a proper rebuttal because it was drafted by plaintiff's counsel as opposed to the expert witness himself. <u>Id</u>.

Nor have the Respondents alleged that the drafting of the affidavits by counsel suborned perjury. The Respondents have also not offered a shred of credible or convincing evidence showing that the affidavits themselves are inaccurate in any fashion. Moreover, this Court's own independent review of the record, and due consideration of the testimony of the witnesses upon cross examination, leads it to conclude that the testimony proffered by STC is credible and trustworthy.

Finally, the Court notes that the Respondents have not argued that the offering of the affidavits was procedurally improper in the first instance. The record reflects that this Court's pre-trial order permitted the parties to present direct testimony by way of affidavit, subject to the requirement that the witness be present in the courtroom for cross examination if a party so requested. Also, except for hearsay objections, other objections by a party were preserved

as to the affidavits (e.g., relevance, etc.).  No party objected to this process, and at trial the affidavits were offered by STC and the opportunity for cross examination was provided to the Respondents.  These circumstances and applicable law, therefore warrant the denial of the motion *in limine*.

## The Weight of the Evidence Supports the Construction Advocated by STC

In support of its interpretation of the relevant language, STC offered into evidence the affidavit testimony of Teitz, Enos, Tarpey, and Fuchs, as well as email correspondence between the representatives of STC, Debtor's counsel, the Debtor's management team, and Mr. Mostoller concerning the circumstances surrounding the formation of the Final DIP Order.  In addition, Teitz, Enos, and Fuchs were subject to cross-examination and re-direct examination.

Of significant interest, the affidavits and testimony set forth the sequence of events surrounding the drafting of the Final DIP Order.  They also reference both emails between the Parties and terminology utilized by the Parties during the negotiation that are specific to the pledged tax refund.

The gist of this evidence is that the Parties understood that the entirety of any refund to be generated on account of the 2015 operating losses was referred to by the Parties as the "2015 refund." See Fuchs Affidavit ¶25; Teitz Affidavit ¶19, and; Enos Affidavit ¶¶11-13.

The record further reflects that throughout the formation of the Final DIP Order the Parties' utilized the term "2015 refund" to refer to any and all tax refunds due Mr. Mostoller on account of the 2015 operating losses of the

36

Debtor (less the IRS offset). Significantly, Teitz, Enos, and Fuchs all testified to

as much. See Fuchs Affidavit ¶25; Teitz Affidavit ¶19, and; Enos Affidavit ¶13.

Although Mr. Mostoller has not conceded that he manifested the term "2015

refund" with the same meaning as understood by STC, Mr. Mostoller did not

testify at trial.  Moreover, the weight of the evidence is that as a member of the

Debtor's management team, as well as the recipient of e-mail correspondence

regarding the negotiation of the financing package,[9] Mr. Mostoller no doubt was

aware of this understanding by STC and never voiced an objection and never

advised STC of his disagreement to it.

However, to the extent that Mr. Mostoller could claim ignorance of STC's

(as well as Teitz's and Fuch's) understanding of the deal, Mr. Mostoller's

knowledge of the size of the refund to be pledged obviously contradicts his

position.  As discussed above, following the Debtor's bankruptcy filing, it

became readily apparent that the Debtor was in desperate need for post-

petition financing, which it sought from STC.  However, in order to induce STC

to provide financing, Fuchs credibly testified that the Debtor's management

team, including Mr. Mostoller, understood that the collateral to be pledged to

STC would need to be significant. Tr. of Jan. 26, 2018 Hr'g 44:15-45:22, ECF

No. 1139.  After identifying the potential of offering a tax refund as collateral,

---

[9] In addition to being an addressee of e-mail communications during the negotiation (ex. Exhibits 12, 16), both Teitz and Fuchs testified that they regularly forwarded e-mail communications regarding the negotiations to Mostoller. See Teitz Affidavit ¶ 27; Tr. of Jan. 26, 2018 Hr'g 38:03-38:06, ECF No. 1139.  Moreover, Fuchs testified that during the negotiations of debtor-in-possession financing, he had several conversations with Mr. Mostoller regarding the necessity to pledge the tax refund. See Tr. of Jan. 26, 2018 Hr'g 35:19-40:17, ECF No. 1139.

Teitz consulted with the accounting firm of Baker Tilly Virchow Krause, LLP ("Baker Tilly"), who had filed the Debtor's and the Respondents' 2014 tax returns. Teitz Affidavit ¶¶11, 16. The estimated amount of the tax refund to be generated by the Debtor's 2015 operating losses was estimated to be in the range of $2 million to $2.5 million, subject to approximately $1.2 million in outstanding tax offsets.    This is precisely the range of refund that was ultimately received in this case.

Fuchs testified that during the negotiations of debtor-in-possession financing, he had several conversations with Mr. Mostoller regarding the necessity that Mr. Mostoller pledge the tax refund. See Tr. of Jan. 26, 2018 Hr'g 35:19-40:17, ECF No. 1139. Fuchs averred that although Mr. Mostoller waivered from time to time on whether to pledge the tax refund, Mr. Mostoller ultimately conceded to it because the pledge was necessary to obtain financing from STC.

Further, Fuchs testified that Mr. Mostoller was aware that the tax refund subject of the pledge was anticipated to be between $2 - $2.5 million, subject to certain tax setoffs. See Tr. of Jan. 26, 2018 Hr'g 35:19-40:17, ECF No. 1139. As that amount was the total amount anticipated to be refunded on account of the operating losses, Mr. Mostoller was fully aware that the term "2015 Federal tax refund" in paragraph 6 of the Final DIP Order referred to the entirety of the refund to be generated on account of the 2015 operating losses. Moreover, Fuchs told Mr. Mostoller as much, as Fuchs testified that in discussing the pledge of the tax refund, he explained to Mr. Mostoller that the outstanding

38

taxes would be paid and "then [STC] would be secured by the remaining funds." Tr. of Jan. 26, 2018 Hr'g 42:18-24, ECF No. 1139.

Finally, if there was any lingering doubt as to the scope of the pledged collateral as communicated to Mr. Mostoller, Mr. Mostoller was clearly made aware of STC's interpretation of the pledge through e-mail communications. For example, during the negotiation of the Interim DIP Order, the Parties exchanged e-mails containing the proposed Interim DIP Order. In discussing the particular language, including the term "Tax Refund," STC's Counsel communicated to Fuchs and Teitz, in part:

> David. I have alerted the client to the debtor's intention to use the federal tax refund to pay federal and state withholding taxes of the debtor. I will let you know client response once I hear back from them. I am not sure that they or I understood this intention previously. **The figures that we relied upon were a tax year loss of $8 to $10 million with a federal refund expected of no less than $1.8 million and perhaps up to $2.2 million**. We understood the withholding tax obligation about which you previously referred to total approximately $1.3 million. Does the withholding tax figure that was previously provided take the state piece into account? Have your views about these figures changed with the passage of time. . . .

*Somerset Trust Company Exhibits*, Ex. 12 (emphasis added). This e-mail was forwarded to Mr. Mostoller by Fuchs, and it is obvious by its content that the parties' bargain is that the refund at issue is not limited to the refund amounts set forth in a 2015 tax return. Rather, it is any tax refund of Mr. Mostoller attributable to the 2015 tax year losses of the Debtor.

Moreover, just days before the entry of the Final DIP Order, on December 28, 2015, Mr. Mostoller received an e-mail from Teitz reading, in part, that "based on est. GAAP loss of ($15.0mm), estimated tax refund from IRS =

$2.5mm to Larry M. . . . this refund will be used to settle unpaid 941 taxes w-

IRS ($1.5mm) & balance to pay-down STC loans as per DIP loan agreement."

See *Somerset Trust Company's Exhibits* Ex. 16; Tr. of Jan. 26, 2018 Hr'g 82:10-

83:24, ECF No. 1139.  Again, evidencing that Mr. Mostoller was on notice that

the other parties, including STC, manifested an intent that a reference to the

"2015 refund" would be a reference to the entire refund to be generated by the

2015 operating losses of the Debtor.

This understanding was further iterated at the hearing on the entry of

the Final DIP Order.   At that hearing, and in Mr. Mostoller's counsel's

presence, counsel for the Debtor (Attorney Fuchs) explained that in the effort to

obtain financing from STC, the tax refund due to Mr. Mostoller in the

approximate amount of $2 million - $2.5 million (again the full amount of the

refund due on account of the 2015 operating losses), subject to certain offsets

for tax obligations, had been pledged to STC as a security for the financing. Tr.

of Jan. 5. 2016 Hr'g 8:9-17, ECF No. 1073.  Counsel for STC then explained

STC's understanding of the tax refund pledge on the record by stating:

> I would also note to the Court that, to the extent that the tax
> refund is actually property of Mr. Mostoller, he has pledged all
> rights in that tax refund, after tax obligations are otherwise paid,
> for the benefit of Somerset Trust, specifically in the order, as
> consideration for the debtor-in-possession financing.

Tr. of Jan. 5, 2016 Hr'g 12:7-12, ECF No. 1073. No objection or comment was

made by Mr. Mostoller's counsel to signify a conflicting understanding by Mr.

Mostoller.

These circumstances surrounding the formation of the Final DIP Order demonstrate that the Parties—including Mr. Mostoller—manifested an intention for the phrase "2015 refund" to refer to the entire refund due on account of the 2015 operating losses of the Debtor regardless of the tax year.

Given the Parties' manifested understanding of the term "2015 refund," the Court finds STC's proffered reading of the phrase "2015 Federal tax refund due to him individually, but attributable to the operating losses of the Debtor" to be reasonable. It is therefore clear that the Parties intended for the tax refund pledge to be for the entire tax refund due on account of the 2015 operating losses. See Fuchs Affidavit ¶35 ("At all relevant times—from the time the idea was generated to include the anticipated tax refund as additional collateral to secure STC's commitment to extend DIP financing, to the date the Bankruptcy Court entered an order approving the DIP financing on a final basis—I understood that the intention of all parties involved was that the anticipated tax refund to be generated on account of the Debtor's 2015 operating losses was to be assigned to STC to secure STC's commitment to extend DIP financing and to allow the Debtor's continued use of its cash collateral."); Teitz Affidavit ¶29; Enos Affidavit (discussing that the refund generated on account of the losses was referred to as the "2015 refund" and that the "2015 refund" was pledged).

Furthermore, there is credible testimony that Mr. Mostoller himself either intended or at least understood STC's understanding of the bargain. Mr. Mostoller cannot now at this late hour change his mind or the deal. This

41

conclusion is particularly acute since "it is a central principle of contract interpretation that if a party knew or had reason to know of the other parties' interpretation of terms of a contract, the first party should be bound by that interpretation." <u>Bohler-Uddeholm</u>, 247 F.3d at 99; <u>see also</u> <u>Emor, Inc. v. Cyprus Mines Corp.</u>, 467 F.2d 770, 775-776 (3d Cir. 1972) (citing 3 Corbin, On Contracts, §537, at 51-42 (1960), <u>and</u> <u>United States v. Stuart</u>, 489 U.S. 353, 368 n.7, 109 S. Ct. 1183, 1192, 103 L. Ed. 2d 388 (1989) (discussing the proper interpretation of a treaty, "It is hornbook contract law that the proper construction of an agreement is that given by one of the parties when 'that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.' <u>Restatement (Second) of Contracts</u> § 201(2)(b) (1981).").

Not to be forgotten in this analysis is that Mr. Mostoller's actions post-entry of the Final DIP Order are also indicia that the Respondents understood and conceded that under the Final DIP Order STC is entitled to at least half of the proceeds of the Refund Check.

For example, during the hearing on the Motion to Compel, Mr. Mostoller relayed to the Court that he had been informed that the tax refund due on the 2015 federal tax return, which Mr. Mosteller indicated to be $125,000, had already been applied against the outstanding "nine hundred and eighty some thousand dollars" in tax obligations. <u>See</u> Tr. of Jan. 26, 2017 Hr'g 64:19-65:04, ECF No. 1055.  Thus, Mr. Mostoller was aware that the entirety of the refund of taxes paid in the 2015 tax year was offset by pre-existing tax obligations.

42

Nonetheless, Mr. Mostoller's protests at the hearing concerned not whether any portion of the remaining refund due to him on the account of the collective Federal Tax Returns was owed to STC, but instead his arguments were limited solely to claims that (i) he had not assigned his wife's portion of the refunds, and (ii) he should not be required to execute a power of attorney to give STC power over the entire refund. At no time did Mr. Mostoller contend that STC was owed no portion of the forthcoming refund.  In fact, Mr. Mostoller averred that upon receipt of the refund, STC would be paid its half:

> Mr. Mostoller:    . . . I believe, and I might as well say it, that Somerset Trust is due half of the tax refund that was due to me individually minus what's owed to the Internal Revenue Service. . . .

Tr. of Jan. 26, 2017 Hr'g 59:23-60:01, ECF No. 1055.  Mr. Mostoller also represented that he was "going to try and help [STC] get their money." Tr. of Jan. 26, 2017 Hr'g 59:11, ECF No. 1055.

Based on the forgoing, the Court finds that STC's interpretation is the appropriate interpretation under the circumstances of this case.

The Court further notes that the Respondents advanced additional arguments in support of their efforts to obtain the full proceeds of the Refund Check.  Specifically, the Respondents contend that this dispute is largely caused by STC's failure to complete adequate due diligence upon the closing of the loan subject to the Final DIP Order.  The Court is unsure of the relevance of this argument, but finds that the Respondents' efforts to lay blame upon STC are misplaced.

43

The circumstances of the negotiation and entry of the Final DIP Order are as follows. At the time of the Debtor's bankruptcy case filing on November 9, 2015, the Debtor was cash-strapped and in desperate need of continued access to cash-collateral and post-petition financing. Teitz, recognizing that the refund on account of the Debtor's net operating losses could be pledged as collateral, approached STC to induce it to lend funds.  In connection therewith it was represented to STC that the anticipated "2015 refund" would be in excess of $2 million with approximately a $1.2 million offset. It was further represented that these figures were provided by Baker Tilly, the accounting firm which filed the Debtor's and the Respondents' 2014 tax returns. See Enos Affidavit ¶11. At STC's urging, the Debtor, through Teitz, sought further information from Baker Tilly regarding the anticipated tax refund, but Baker Tilly declined to provide the information without first being retained with payment in advance and without further documentation from the Debtor. See Enos Affidavit ¶17-18; Teitz Affidavit ¶23. Nonetheless, the Debtor represented to STC that Baker Tilly had verbally confirmed that a refund in excess of $2 million was "a very realistic estimate." See Enos Affidavit, ¶17, Ex. 3; Teitz Affidavit ¶24.

At this point, "given the Debtor's liquidity crisis, discussions between STC and Debtor related to DIP financing and the Debtor's continued use of cash collateral were proceeding at an extremely rapid pace." Teitz Affidavit ¶ 22. Without an accountant having been retained, STC relied on the Debtor's representations as to the amount of the "2015 refund." See Tr. of Jan. 26, 2018

44

Hr'g 25:12-16, ECF No. 1139.   Throughout the negotiation period, the estimated "2015 refund" remained consistently between $2 million-$2.5 million, subject to tax offset. See Enos Affidavit ¶22.

The "rapid pace" negotiations resulted in the entry of the Interim DIP Order on December 4, 2015, pursuant to which the Debtor received the first $500,000 distribution of its $1,000,000 DIP facility with STC. See Tr. of Jan. 26, 2017 Hr'g 6:11-18. The Interim DIP Order contained the same pledge of Mr. Mostoller's "2015 Federal tax refund due to him individually, but attributable to the operating losses of the Debtor[.] . . ." See Interim DIP Order ¶5. Thus, while the Final DIP Order was entered on January 6, 2016, the phrase subject of this dispute was drafted on an even tighter timeline—less than a month after the Debtor's bankruptcy case filing.

The Respondents argue that the expediency of the negotiation period is of no consequence as it was STC's choice to rely on the statements of the Debtor's management team—a management team which included Mr. Mostoller— regarding the amount of the tax refund and forgo intensive due diligence as to the mechanics of how the refund would be generated. See *Post-Trial Brief of Respondents, Larry L. Mostoller and Connie Mostoller* 8, ECF No. 1144. However, the speed at which the Final DIP Order was put together was entirely for the benefit of the Debtor, which was in desperate need of continued access to cash collateral and post-petition financing.   Indeed, in the view of both Fuchs and Teitz, the Debtor's financial condition made STC its only viable option for financing:

45

Robleto:      In Paragraph 12 you say that no other options for DIP
              financing were considered because of the short
              timeframe and the debtor's fragmented borrowing. Can
              you tell me first why wouldn't the timing allow you to
              at least consider other options?

Fuchs:        Well, I don't think there was any time or other viable
              options present. We were essentially early on in the
              case. There was very little funds left available to pay
              the ongoing expenses and it was a battle by Mr.
              Mostoller every day to find money to pay payroll, fuel,
              other things that he needed to keep the business
              going.

Robleto:      I understand but the time required to consider
              additional, the sources of DIP financing, not to
              actually go out and make proposals or to pitch the
              possibility of DIP financing but to consider other
              potential lenders. I'm asking why would the
              understandably short period of time limit the scope of
              who you might consider for that purpose?

Fuchs:        Well, there was only one logical choice and it was
              [STC] because they had a first position blanket lien
              and Mr. Teitz was out there for Compass as—in a
              financial advisory role and he believed, I think, that
              that made the most sense and was the direction where
              we should put our efforts.

Despite the benefit to the Debtor, the Respondents now aver that STC

should not be rewarded for its "rapid paced" negotiations and limited due

diligence. Respondents' Post-Trial Brief 8, ECF No. 1144. However, it is the

Respondents, specifically Mr. Mostoller, who are seeking to take advantage of

both sides of the coin. First benefitting as the sole owner of the Debtor from

STC's willingness to fast-track the negotiation of a debtor-in-possession loan

facility that was crucial to the Debtor's ability to carry-on under chapter 11 of

the Bankruptcy Code, and now faulting STC for assisting the Debtor so

46

quickly. The Court finds this position untenable. Further, the Court finds that to award the remainder of the proceeds of the Refund Check to the Respondents would be an absurd and unreasonable result given that (a) the due diligence period was constrained for the benefit of the Debtor, (b) STC relied on the Debtor's representations, and (c) there is overwhelming evidence that the Parties understood that the deal was to pledge the entirety of the refund generated by the 2015 operating losses to STC.    Thus, STC's interpretation is the only reasonable one.

## The Stern Challenge is Without Merit

Finally, the Court notes that the Respondents have contended that this Court lacks the authority to enter a final order with respect to this controversy. The Respondents essentially contend that the Refund Check was owned by the Respondents as tenants-by-the-entireties.   As a result, they contend that this controversy is a both non-core proceeding under applicable state law and a proceeding which this Court may not adjudicate on a final basis pursuant to the United States Supreme Court's decision in Stern v. Marshall, 564 U.S. 462 (2011).[10]

The Stern challenge by the Respondents is unconvincing for a number of reasons.   First, as set forth in the initial parts of this *Memorandum Opinion*,

---

[10]   Even if this this controversy constitutes either a non-core matter or a matter that required adjudication by an Article III Judge, this *Memorandum Opinion* can be construed to be a report and recommendation (or proposed findings of fact and conclusions of law) to the United States District Court. See Fed.R.Bankr.P. 9033; see also Executive Benefits Agency, Inc. v. Arkison, 134 S.Ct. 2165, 2172 (2014).

this Court has jurisdiction to interpret and enforce its prior orders. <u>See</u> <u>Travelers Indem. Co. v. Bailey</u>, 557 U.S. at 149.

Second, this matter is a core proceeding over which the Court has both subject-matter jurisdiction and the requisite statutory authority to enter a final judgment. Indeed, enforcement of the Final DIP Order concerns the administration of this estate inasmuch as the funds to be paid to STC effectively reduces its post-petition claim. It also deals with the enforcement of the Final DIP Order and therefore is a controversy that concerns both an order "in respect to obtaining credit" and the Debtor's use of cash collateral. Furthermore, this controversy is a request for a determination of the validity, extent or priority of liens of STC against the applicable tax refund, and obviously the controversy affects the adjustment of the debtor-creditor relationship. All of these types of matters fall within the core jurisdiction of this Court. <u>See</u> 28 U.S.C. §§157(b)(2)(A), 157(b)(2)(D), 157(b)(2)(K), 157(b)(2)(M), 157(b)(2)(O), and 1334(b).

Third, the record reflects that Mr. Mostoller expressly consented to entry of the Final DIP Order and both Respondents filed their own Motion for Release with this Court. In addition, the claim that a portion of the refund belongs to Mrs. Mostoller was addressed by the partial release of the refund, which the Respondents gladly accepted. These circumstances clearly evince that the Respondents consented to this Court's final determination of the parties' relative rights and interests in the proceeds of the Refund Check. This consent obviates any <u>Stern</u> based challenge the Respondents may have. <u>See Ardi Ltd.</u>

48

P'ship v. The Buncher Co. (In re River Entm't), 467 B.R. 808 (Bankr. W.D. Pa. 2012) and Wellness Int'l Network, Ltd. v. Sharif, 135 S.Ct. 1932 (2015).

Fourth, it appears that after the Court authorized the partial release (and after the evidentiary hearing on this matter), the Respondents have not advanced the "entireties theory" of their case. Even if they did not abandon this theory for relief, this Court concludes that the weight of the evidence and applicable law warrants the rejection of the entireties claim.

Specifically, the United States Tax Code provides that a refund may only be obtained by the "person who made the overpayment." See 26 U.S.C. § 6402(a); see also Ruscitto v. United States, 629 Fed. App'x 429, 432 (3d Cir. 2015)(quoting Deluane v. United States, 143 F.3d 995, 1006 (5th Cir. 1998)). Courts have also held that "[s]pouses who file a joint return have *separate* interests in any overpayment, the interest of each depending on his or her relative contribution to the overpaid tax." Id. (quoting United States v. Elam, 112 F.3d 1036, 1038 (9th Cir. 1997), which cites additional cases).

With this applicable law in mind, the Court notes that there is no evidence of record that Mrs. Mostoller had any taxable income of her own that contributed to the overpayment of taxes for any of the years at issue. These circumstances warrant a finding that Mrs. Mostoller has no further interest in the remaining proceeds of the Refund Check. As such, the remaining proceeds are the collateral of STC under the Final DIP Order.

Case 15-70766-JAD   Doc 1254   Filed 09/24/18   Entered 09/24/18 11:28:02   Desc Main
Document     Page 50 of 50

### III.
### CONCLUSION

For the reasons set forth above, the Court grants STC's *Motion Seeking Release of Certain Tax Refund Check to Somerset Trust Company* and denies the Respondents' *Motion in Limine to Exclude Extrinsic Evidence*. An appropriate order shall be issued in accordance herewith.

Dated: September 24, 2018

_____
**JEFFERY A. DELLER**
United States Bankruptcy Judge

cc:   Aurelius P. Robleto, Esq.
      Mark E. Freedlander, Esq.
      David Fuchs, Esq.

FILED
9/24/18 8:47 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

50